IN THE UNITED STATES DISTRICT COURT FOR THE
WESTERN DISTRICT OF OKLAHOMA

| | |
|---|---|
| JULIE D. DAVIS, ) | |
| ) | |
| Plaintiff, ) | |
| ) | |
| ) | CIV-14-294-L |
| v. ) | |
| ) | |
| CAROLYN W. COLVIN, ) | |
| Acting Commissioner of Social ) | |
| Security Administration, ) | |
| ) | |
| Defendant. ) | |

## REPORT AND RECOMMENDATION

Plaintiff seeks judicial review pursuant to 42 U.S.C. § 405(g) of the final decision of Defendant Commissioner denying her applications for disability insurance and supplemental security income benefits under Title II and Title XVI of the Social Security Act, 42 U.S.C. §§ 416(I), 423, 1382. Defendant has answered the Complaint and filed the administrative record (hereinafter TR___), and the parties have briefed the issues. The matter has been referred to the undersigned Magistrate Judge for initial proceedings consistent with 28 U.S.C. § 636(b)(1)(B). For the following reasons, it is recommended that the Commissioner's decision be affirmed.

I. <u>Administrative History and Medical Evidence</u>

On April 20, 2011, Plaintiff, who was then 41 years old, protectively filed her applications for benefits. Plaintiff alleged she became disabled on April 6, 2011, due to gout in both knees and depression. (TR 133, 137, 169). Plaintiff previously worked as a home

1

health care aide. (TR 170). Plaintiff testified at a hearing conducted before Administrative Law Judge Porter ("ALJ") on November 9, 2012. She stated that she had been terminated from her previous job in April 2011 because her employer determined she was unable to perform her job duties. She stated she was unable to work because of knee pain due to degenerative arthritis, constant knee and back pain, inability to squat or bend over, inability to lift over 5 pounds, inability to pay attention, difficulty making decisions, and limited ability to sit or stand "too long" because of pain. (TR 29-50).

Plaintiff testified she was being treated for depression and personality disorder. She was in special education classes beginning in fifth grade and dropped out of high school after the eleventh grade when she became pregnant, although she later obtained vocational training in caring for the developmentally disabled. She was not receiving treatment for a back impairment at the time of the hearing. She could take care of her personal needs, help prepare meals, perform some housekeeping and shopping activities, and visit her granddaughters once a month. Plaintiff stated she used a walker when she left her home. She was previously treated for three years by a psychiatrist, Dr. Bhandary. She was being treated by Dr. Gregory for pain management. Plaintiff was taking anti-depressant, sleeping aid, and anti-anxiety medications, as well as narcotic and non-narcotic pain medications.

A vocational expert ("VE") also testified at the hearing.

The medical record reflects office notes of treatment of Plaintiff by Dr. Bhandary between February 2009 and August 2011. (TR 284-311). These notes indicate Dr. Bhandary diagnosed Plaintiff in February 2009 with pathologic gambling, major depression, anxiety

2

disorder, post-traumatic stress disorder ("PTSD"), obsessive-compulsive disorder ("OCD"), panic disorder with agoraphobia, bulemia nervosa, personality disorder, and learning disorder. (TR 284). Dr. Bhandary also noted that Plaintiff had a history of gout, osteoarthritis in her knee joints, back pain, obesity, and chronic pain syndrome. Medications were prescribed. (TR 319).

In April 2009, Plaintiff reported to Dr. Bhandary that her pain and muscle spasms caused by gout and osteoarthritis in her knee joints were "relatively controlled," her social interactions were "good," she was "sleeping well," and she denied medication side effects. (TR 285). In June 2009, Plaintiff reported to Dr. Bhandary that her panic disorder, PTSD, depression, and OCD symptoms were better. (TR 287).

Plaintiff denied symptoms of depression in July 2009, and Dr. Bhandary noted her PTSD, panic disorder, and OCD symptoms were controlled. Dr. Bhandary prescribed Neurontin® for her leg pain symptoms. (TR 288). In August 2009, Plaintiff reported to Dr. Bhandary that her knee pain and muscle spasms were "relatively controlled" and "diminished" on the prescribed medication. Throughout the year 2010, Plaintiff returned to Dr. Bhandary approximately once a month. Dr. Bhandary adjusted her medications based on her reported symptoms, and Plaintiff generally reported she was able to function better with the medications.

In March 2010 and again in April 2010, Plaintiff was treated by a physician's assistant, Mr. Campbell, for chronic knee pain, obesity, gout, and gastrointestinal reflux disease. (TR 246-247). Physical examinations during these visits were reportedly normal.

3

X-rays of Plaintiff's knees conducted in April 2010 revealed the presence of osteoarthritis with mild degenerative changes and spurring. (TR 250).

In February 2011, Plaintiff reported to Dr. Bhandary that her depression was "much decreased" on anti-depressant medication, that her OCD, panic disorder, and PTSD were controlled, that she was able to leave home and attend to necessary responsibilities, that her pain and muscle spasms due to gout and osteoarthritis in her knee joints were "under relative control," that her medications reduced her pain and enabled her to function, she was sleeping good, her social interactions had improved, she had no adverse medication side effects, and she was not having suicidal or paranoid thoughts. (TR 306). Dr. Bhandary made a similar note after Plaintiff's visit in March 2011. (TR 307). Weight loss medication was prescribed for Plaintiff. (TR 307).

In April 2011, Plaintiff was examined by Mr. Campbell for her annual physical. (TR 244). Mr. Campbell noted that a physical examination was normal except Plaintiff was unable to squat. The diagnostic assessment was chronic knee pain and gout. In April 2011 and in June 2011, Dr. Bhandary noted Plaintiff showed "continual progress" in the reduction of her symptoms on the prescribed medications. (TR 308, 309). In June 2011, Plaintiff reported her symptoms were well controlled or better controlled on medications. (TR 310). In August 2011, Dr. Bhandary noted Plaintiff's statement that she was having "a good month," although she reported "some degree of pain all the time." (TR 311).

On August 1, 2011, Dr. Bhandary completed a mental status form and stated on this form that due to her "physical [and] mental" impairments Plaintiff could remember,

4

comprehend and carry out simple instructions but would have a "difficult" time with complex instructions. (TR 321). Dr. Bhandary also opined that it would be "difficult" for Plaintiff to respond to work pressures, supervision, and coworkers. (TR 321).

Although there are no notes of treatment of Plaintiff by Dr. Bhandary after August 2011, Dr. Bhandary completed a form entitled Medical Source Statement - Mental that he signed and dated November 23, 2011. (TR 333-334). On this form, Dr. Bhandary placed check marks to indicate whether Plaintiff could perform a list of work-related mental activities and opined that Plaintiff would have a "marked" or "moderate" impairment in several work-related mental functional areas. In the "remarks" section of the form, Dr. Bhandary noted only that "Pt [sic] has severe psychiatric symptoms that disables [sic] her permanently." (TR 334).

There are notes of treatment of Plaintiff by an unidentified provider at the Wynnewood Medical Clinic between February 2012 and May 2012. (TR 336-339, 411). In May 2012, this provider noted that Plaintiff was "upset" when advised that MRI testing of her knees was interpreted as normal. (TR 411).

There is one note of treatment of Plaintiff by Dr. Gregory for back and knee pain in May 2012. (TR 392). The administrative record includes reports of MRI testing of Plaintiff's knees in April 2012, an x-ray of Plaintiff's right knee in March 2012, an x-ray of Plaintiff's left knee in May 2012, and MRI testing of Plaintiff's thoracic and lumbar spines in December 2012. (TR 340, 403-404, 406-407, 412, 415-418).

Plaintiff underwent a consultative physical examination conducted by Dr. Schatzman

5

on June 10, 2011. (TR 257-263). Dr. Schatzman noted a diagnostic assessment of morbid obesity, knee pain by history, diabetes mellitus, "[q]uestionable cooperation," and "[q]uestionable effort on motor skills." (TR 259).

Dr. Al-Khouri conducted a consultative psychiatric evaluation of Plaintiff on June 10, 2011. (TR 254-255). Dr. Al-Khouri noted a diagnostic impression of major depression, recurrent, moderate, and a GAF[1] score of 85-90.

## II. ALJ's Decision

The ALJ issued a decision dated December 18, 2012. (TR 11-21). Following the agency's well-established sequential evaluation procedure, the ALJ found at step one that Plaintiff had not engaged in substantial gainful activity since her alleged disability onset date of April 16, 2011. At step two, the ALJ found that Plaintiff had severe impairments due to obesity, osteoarthritis, gout, and depression. At step three, the ALJ found that Plaintiff's impairments, considered singly or in combination, did not meet or equal the requirements of a listed impairment, and she was therefore not presumptively disabled.

At the fourth step, the ALJ found that Plaintiff had the residual functional capacity ("RFC") to perform light work limited to occasional use of foot controls, no more than occasional climbing of ramps or stairs, no crawling or climbing of ladders, ropes, or scaffolds, no exposure to temperature extremes, limited to jobs allowing "a sit/stand option, which would allow her to change position at least every 30 minutes," and limited to jobs

---

[1] "The GAF is a subjective determination based on a scale of 100 to 1 of the clinician's judgment of the individual's overall level of functioning." Pisciotta v. Astrue, 500 F.3d 1074, 1076 n. 1 (10th Cir. 2007)(internal quotations omitted).

6

requiring only routine, repetitive tasks and no more than occasional interaction with coworkers and no interaction with the public. (TR 15-16).

Relying on the VE's testimony at the hearing concerning the availability of jobs for a hypothetical individual with this RFC for work, the ALJ found that there were jobs available in the economy that Plaintiff could perform, including the jobs of laundry folder, assembler, and price marker. Based on these findings, the ALJ concluded that Plaintiff was not disabled within the meaning of the Social Security Act.

The Appeals Council denied Plaintiff's request for review, and therefore the ALJ's decision is the final decision of the Commissioner. See 20 C.F.R. §§ 404.981, 416.1481; Wall v. Astrue, 561 F.3d 1048, 1051 (10th Cir. 2009).

III. General Legal Standards Guiding Judicial Review

The Court must determine whether the Commissioner's decision is supported by substantial evidence in the record and whether the correct legal standards were applied. Wilson v. Astrue, 602 F.3d 1136, 1140 (10th Cir. 2010); Doyal v. Barnhart, 331 F.3d 758, 760 (10th Cir. 2003). "Substantial evidence is such relevant evidence as a reasonable mind might accept as adequate to support a conclusion. It requires more than a scintilla, but less than a preponderance." Lax v. Astrue, 489 F.3d 1080, 1084 (10th Cir. 2007). The "determination of whether the ALJ's ruling is supported by substantial evidence must be based upon the record taken as a whole. Consequently, [the Court must] remain mindful that evidence is not substantial if it is overwhelmed by other evidence in the record." Wall, 561 F.3d at 1052 (citations, internal quotation marks, and brackets omitted).

The Social Security Act authorizes payment of benefits to an individual with disabilities. 42 U.S.C. § 401 *et seq*. A disability is an "inability to engage in any substantial gainful activity by reason of any medically determinable physical or mental impairment which can be expected to result in death or which has lasted or can be expected to last for a continuous period of not less than 12 months." 42 U.S.C. § 423(d)(1)(A); accord, 42 U.S.C. § 1382c(a)(3)(A); see 20 C.F.R. § 416.909 (duration requirement). Both the "impairment" and the "inability" must be expected to last not less than twelve months. Barnhart v. Walton, 535 U.S. 212 (2002).

IV. Analysis of Medical Source Statements

Plaintiff asserts that the ALJ erred in evaluating the second medical source statement provided by her treating psychiatrist, Dr. Bhandary, in November 2011. It is true, as Plaintiff points out, the VE testified at the hearing that an individual with the work-related mental limitations described in Dr. Bhandary's second medical source statement could not perform competitive work. (TR 55). However, the ALJ was not bound to adopt this testimony.

Generally, a treating physician's opinion is entitled to controlling weight if it is supported by medically acceptable clinical and laboratory diagnostic techniques. Watkins v. Barnhart, 350 F.3d 1297, 1300 (10th Cir. 2003) (quoting Social Security Ruling 96-2p, 1996 WL 374188, at *2). However, "[m]edical evidence may be discounted if it is internally inconsistent or inconsistent with other evidence." Pisciotta v. Astrue, 500 F.3d 1074, 1078 (10th Cir. 2007)(internal quotation marks omitted). When an ALJ finds that a treating

8

physician's opinion is not entitled to controlling weight, the ALJ must decide "whether the opinion should be rejected altogether or assigned some lesser weight." Id. at 1077. "Treating source medical opinions not entitled to controlling weight . . . must be evaluated in light of the factors in the relevant regulations, 20 C.F.R. §§ 404.1527 and 416.927." Newbold v. Colvin, 718 F.3d. 1257, 1265 (10th Cir. 2013)(quoting Watkins, 350 F.3d at 1300).

In this case, the ALJ's decision reflects consideration of the relevant medical evidence, including Dr. Bhandary's two medical source statements, the results of MRI and x-ray testing of Plaintiff's knees, the reports of the consultative examiners, and the opinions of the state agency medical consultants. (TR 17-20). The ALJ summarized Dr. Bhandary's office notes of his treatment of Plaintiff and concluded the notes showed "generally routine" treatment that was "conservative in nature." (TR 17). The ALJ also discussed the medical source statements submitted by Dr. Bhandary, stating:

> On August 1, 2011, the claimant appeared to be alert and oriented [times] 3. She displayed no sign of suicidal ideation, homicidal ideation or psychosis. The prognosis was poor, but Dr. Bhandary found the claimant able to carry out simple instructions. (Ex. 9F). On November 23, 2011, Dr. Bhandary submitted a medical source statement finding the claimant to be <u>markedly</u> impaired in her abilities to understand, carry out and remember detailed instructions, maintain attention and concentration for extended periods, perform activities within a schedule, maintain regular attendance and be punctual within customary tolerances, work in coordination with others with or in proximity to others without being distracted by them, complete a normal workday and workweek without interruptions from psychologically-based symptoms, perform at a consistent pace without an unreasonable number and length of rest periods, accept instructions and respond appropriately to supervisor criticism, travel in unfamiliar places, use public transit, set realistic goals or make plans independently of others. However,

9

> he found the claimant <u>moderately</u> impaired in her abilities to remember locations and worklike procedures, sustain an ordinary routine without special supervision, interact appropriately with the public, get along with coworkers or peers without distracting them or being distracting, respond appropriately to changes in work setting, be aware of normal hazards and take appropriate precautions. Overall, Dr. Bhandary found that the claimant had "severe psychiatric symptoms that disable her permanently." (Ex. 13F). Although the undersigned gave great weight to the finding that the claimant is capable of simple instructions, Dr. Bhandary's [remaining] assessments were not supported by the findings on examination and inconsistent with the record as a whole. They were therefore afforded only partial weight.

(TR 19-20).

Plaintiff contends that the ALJ's rationale for "rejecting" Dr. Bhandary's opinions set forth in the second medical source statement was an unsupported conclusion. However, the ALJ provided two reasons for giving "partial weight" to ( and not rejecting) Dr. Bhandary's opinions in the second medical source statement. First, the ALJ stated that the opinions were not supported by the psychiatrist's own treatment records. Plaintiff has not argued that this is an improper or unsupported reason for the ALJ's finding. Nor has Plaintiff pointed to any of Dr. Bhandary's office notes that would provide evidence contradicting the ALJ's finding.

Plaintiff argues only that the ALJ's second reason, that Dr. Bhandary's opinions were "inconsistent with the record as a whole," is unsupported. In a peculiar argument, Plaintiff points to another finding by the ALJ that the state agency medical consultants' mental RFC "assessments received little weight, as subsequent medical records found [Plaintiff] more impaired than noted." (TR 19). Plaintiff only pointed to a portion of the ALJ's reasoning in this respect, however, as the ALJ went on to state that "[i]n particular, the claimant has been

10

restricted to routine, repetitive tasks with only occasional coworker interaction and no public interaction." (TR 19). This statement is an obvious reference to the opinion set forth in Dr. Bhandary's first medical source statement.

The record reflects that Dorothy Millican-Wynn, Ph.D., completed a Psychiatric Review Technique form dated July 5, 2011, in which the medical consultant opined that Plaintiff's mental impairment due to depression was not severe. (TR 264). This opinion was based entirely on Dr. Al-Khouri's report of his consultative psychiatric evaluation of Plaintiff. (TR 276). Dr. Millican-Wynn noted that she had not received any records from Dr. Bhandary.

Alicia Maki, Ph.D., affirmed the opinion of Dr. Millican-Wynn on September 19, 2011. (TR 323). Dr. Maki noted that the Plaintiff's treating source records did not support the presence of marked mental limitations, she "appear[ed] more impacted by physical than by mental health [symptoms], she had received mental health treatment but there were no records of prior hospitalizations for mental health treatment, and her treating source found she was able to manage funds, thus "indicat[ing] cognitive function is [within normal limits]." (TR 323).

Plaintiff contends that the only medical evidence of a "psychological" nature appearing in the record after the state agency medical consultants' opinions was Dr. Bhandary's November 2011 medical source statement. The ALJ, of course, pointed out in the decision that it was Dr. Bhandary's first medical source statement, not his second medical source statement, that provided a very valid and proper reason for the finding that the state

11

agency medical consultants' nonsevere assessment was given only "little weight."

Regarding Dr. Bhandary's second medical source statement, the ALJ stated in the decision that the opinions expressed therein by Dr. Bhandary were given only "partial weight" because (1) the opinions were inconsistent with the psychiatrist's own treatment records and (2) the opinions were "inconsistent with the record as a whole." (TR 20). There is no dispute that Dr. Bhandary's opinions set forth in the second medical source statement were not consistent with the psychiatrist's own treatment records. The record "as a whole" included Dr. Bhandary's first medical source statement, and the opinions expressed in that medical source statement are certainly inconsistent with the opinions expressed in Dr. Bhandary's second medical source statement. Moreover, the record "as a whole" includes the report of the consultative psychiatric examiner, Dr. Al-Khouri, who reported no deficits in functioning in a mental status examination of Plaintiff and also assessed Plaintiff with a GAF score of 85-90, indicating she was functioning normally. (TR 254-255). Therefore, the ALJ's rationale is well supported by the record, and the ALJ did not err in evaluating Dr. Bhandary's medical source statements.

V. Evaluation of Plaintiff's Obesity

Plaintiff's second and final argument for overturning the Commissioner's decision is that the ALJ failed to properly evaluate Plaintiff's obesity impairment. The ALJ recognized in the decision that Plaintiff had a severe obesity impairment. The ALJ's decision includes specific references to the medical evidence in the record, including Plaintiff's treatment by Dr. Bhandary, Dr. Gregory, the provider at the Wynnewood Medical Clinic, and the report

12

of the consultative physical examiner, Dr. Schatzman, as well as the reports of MRI and x-ray testing of Plaintiff's knees and back.

Relying on Social Security Ruling ("SSR") 02-1p, Plaintiff asserts that the ALJ failed to properly assess her RFC in light of her obesity. The ALJ recognized in the decision the guidance provided by the agency in SSR 02-1p with respect to the evaluation of an obesity impairment. The ALJ stated that he had taken into account the administrative ruling's guidance at each subsequent step of the evaluation, "even though no treating or examining medical source has specifically attributed additional or cumulative limitations to the claimant's obesity." (TR 14).

Plaintiff argues that this statement is mere "boilerplate" and is not adequate to address her limitations as a result of her obesity. The ALJ found that Plaintiff was restricted to the performance of a limited range of light work. Plaintiff points to no medical evidence in the record in which treating or examining physicians have indicated her obesity causes additional limitations beyond those ascribed in the RFC. As the ALJ pointed out in the decision, Dr. Schatzman reported that during his examination of Plaintiff in June 2011 Plaintiff walked with a slow, ponderous gait but she did not appear to need walking aids, she was able to heel and toe walk and walk in tandem without difficulty, and she did not exhibit neurological deficits. The ALJ also expressly considered the opinions of the agency's medical consultants, Dr. Rabelo and Dr. Bird. In an assessment dated July 15, 2011, Dr. Bird opined that Plaintiff had no severe physical impairment, considering her obesity and other medical evidence in the record. (TR 279). In a physical RFC assessment dated October 3, 2011, Dr.

13

Bird opined that considering Plaintiff's weight of 302 pounds and specific medical evidence in the record, she was capable of performing work at the medium exertional level. (TR 324-331). The ALJ accorded Dr. Rabelo's opinion "minimal weight" and accorded Dr. Bird's opinion "partial weight" in light of medical evidence appearing in the record after Dr. Bird's assessment. (TR 19). No physician opined that Plaintiff's obesity resulted in greater limitations than the limitations ascribed by the ALJ in the RFC assessment. No error occurred with respect to the ALJ's evaluation of Plaintiff's obesity impairment.

In the ALJ's decision, the ALJ considered the credibility of Plaintiff's subjective complaints of disabling pain and limitations and found those complaints were not entirely credible. Plaintiff does not object to the credibility determination.

Among other reasons, the ALJ pointed to Plaintiff's receipt of unemployment benefits throughout 2011 as a reason for the credibility finding. (TR 19). A disability claimant's receipt of unemployment benefits is a proper reason for discounting the claimant's credibility. See Pickup v. Colvin, __ Fed. App'x. __, No. 14-5095 (10th Cir. 2015)(unpublished op.)(noting "[t]here is an obvious inconsistency between claiming an ability to work for purposes of obtaining unemployment compensation and claiming an inability to work for purposes of obtaining social security benefits. The ALJ was thus entitled to rely on Pickup's receipt of unemployment benefits as a reason weighing against the credibility of her claim of a completely disabling impairment").

At step five, the ALJ relied on the testimony of the VE in response to hypothetical questioning that included the limitations found in the RFC assessment. The VE's testimony

14

that jobs existed in the economy for such an individual to perform provides substantial evidence to support the ALJ's step five decision. Consequently, the Commissioner's decision should be affirmed.

## RECOMMENDATION

In view of the foregoing findings, it is recommended that judgment enter AFFIRMING the decision of the Commissioner to deny Plaintiff's applications for benefits. The parties are advised of their respective right to file an objection to this Report and Recommendation with the Clerk of this Court on or before April 28th, 2015, in accordance with 28 U.S.C. § 636 and Fed. R. Civ. P. 72. The failure to timely object to this Report and Recommendation would waive appellate review of the recommended ruling. Moore v. United States, 950 F.2d 656 (10th Cir. 1991); cf. Marshall v. Chater, 75 F.3d 1421, 1426 (10th Cir. 1996)("Issues raised for the first time in objections to the magistrate judge's recommendation are deemed waived.").

This Report and Recommendation disposes of all issues referred to the undersigned Magistrate Judge in the captioned matter, and any pending motion not specifically addressed herein is denied.

ENTERED this 8th day of April, 2015.

GARY M. PURCELL
UNITED STATES MAGISTRATE JUDGE